```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION


Patrick A. Gilbert,            :

         Plaintiff,            :

     v.                        :    Case No. 2:13-cv-0355

Commissioner of Social         :    JUDGE ALGENON L. MARBLEY
    Security,                       Magistrate Judge Kemp
                               :
         Defendant.
```

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Patrick A. Gilbert, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income.  Those applications were filed on November 2, 2011 and alleged that Plaintiff became disabled on April 30, 2010.

After initial administrative denials of his applications, Plaintiff was given a hearing before an Administrative Law Judge on October 22, 2012.  In a decision dated November 26, 2012, the ALJ denied benefits.  That became the Commissioner's final decision on February 21, 2013, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on June 11, 2013.  Plaintiff filed his statement of specific errors on July 8, 2013.  The Commissioner filed a response on November 12, 2013.  Plaintiff filed a reply brief on November 26, 2013, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 25 years old at the time of the administrative hearing and had a high school education, testified

as follows. His testimony appears at pages 35-51 of the administrative record.

Plaintiff acknowledged, in response to questions from the Administrative Law Judge, that he had not worked very much, and that he had been in prison once, in 2007, for breaking and entering, and also served a week in jail in 2010. He had used drugs in the past, but not for the last six months.

Plaintiff testified that migraine headaches prevented him from working, as did his bipolar disorder. He said he had headaches every day, which he tried to control with Tylenol, and migraines once a week. He also described problems with both of his knees which made it hard for him to stand for long periods of time or to walk long distances.

Plaintiff was diagnosed with bipolar disorder at age 16. At the time of the hearing, he was seeing both a psychiatrist and a counselor. His mood and temper were problems for him.

Plaintiff was able to drive, to shop, and to maintain friendships. He cooked, vacuumed, and was able to do laundry. He did have some issues with reading comprehension and also with stress from his surroundings, which caused him to experience anxiety. He had not held a job longer than seven months, and mostly worked at fast food restaurants. In work settings, he had difficulty getting along with managers or coworkers. Plaintiff also testified that he had been to the emergency room several times because of suicidal thoughts and that he had been hearing voices since he was young.

### III. The Medical Records

The medical records in this case are found beginning on page 310 of the administrative record. The pertinent records, all of which relate to Plaintiff's psychological condition, can be summarized as follows.

Plaintiff underwent a consultative psychological

examination, performed by Dr. Hrinko, on July 14, 2010. Plaintiff reported that he had been in special education classes in high school due to a learning disability. He had also been suspended from school twice for marijuana use. His medical conditions include migraine headaches and asthma. Plaintiff said that he last worked a part-time job at a sports bar and quit because he was not being given more hours. He told Dr. Hrinko that it was his migraines that interfered with his ability to work.

Plaintiff said he had not made any suicide attempts since age 16. His mood at the examination was within normal limits. He did not show any problems with attention or concentration, and his memory was intact. He reported problems with mood swings. Dr. Hrinko diagnosed a mood disorder and cannabis abuse in partial remission, rated Plaintiff's GAF at 65, and thought that Plaintiff was only mildly impaired in a few work-related areas (relating to others and withstanding work stress). Other work functions were not impaired at all. (Tr. 398-400).

An emergency room note from Mary Rutan Hospital dated September 25, 2011, shows that Plaintiff sought treatment that day for depression, suicidal thoughts, and homicidal thoughts. At that time, his mood and affect were flat and bizarre. He was discharged to his mother's care after meeting with a counselor. (Tr. 407-09). The triggering event appears to have been a fight with his girlfriend. He had a similar experience about a year before that. (Tr. 487-89).

Plaintiff's psychiatrist, Dr. Griffith, completed a mental status questionnaire on January 3, 2012. She said she had been treating Plaintiff since October 7, 2011 - about three months before she filled out the form - and she described Plaintiff as having a mixed depressed and irritable mood, periods of decreased energy and appetite, periods of increased energy and racing

thoughts, and intermittent suicidal ideation.  His insight and judgment were fair, he tended to forget details, and he could maintain attention for only brief intervals.  His ability to sustain concentration and persist at tasks was poor.  She believed that he had been unable to maintain a competitive pace at prior jobs and that working fast could bring on his migraine headaches.  (Tr. 513-15).  Plaintiff's caseworker also completed a form on which he stated that Plaintiff had difficulty taking orders from supervisors and that he had poor stress tolerance.  He did, however, have a good ability to prepare his own food, do household chores, shop, and take care of his personal hygiene.  (Tr. 517-18).  These reports are followed by treatment notes, many of which describe either assisting Plaintiff in the process of applying for Social Security benefits or his frustration in being unable to find work.  One note did describe him as delusional, and references were made to his hearing voices, although he also showed some ability to cope with frustration and some mood stability.

    On July 31, 2012, Dr. Griffith wrote a letter describing her opinion of Plaintiff's functional limitations.  She had been seeing him for about nine months at that time.  She stated that although medication has improved his mood, he retained "substantial residual symptoms of irritability, fearfulness of being around groups of people, and a tendency to hear more voices when stressed such as pressure associated with work."  Her diagnoses included bipolar disorder, a history of ADHD and Oppositional Defiant Disorder, and an antisocial personality disorder.  She believed he would deteriorate in a work environment.  She also completed a residual functional capacity assessment form which showed marked impairment in Plaintiff's ability to work at a consistent pace, to maintain attention and concentration for more than brief periods of time, and to

withstand work stress. She also thought he would take 5 or more days off work for unscheduled absences in any given month. (Tr. 575-79). The balance of the medical records are more treatment notes, and they are similar to those described above.

Finally, there is a report from one or more state agency reviewers, found not in the medical records section of the administrative record but in the section indexed as "Payment Documents and Decisions," which assesses Plaintiff's mental residual functional capacity. According to that assessment, Plaintiff's only significant psychological limitations were in the areas of completing a normal workday and work week without an unreasonable number of interruptions (the limitation was moderate), and adapting to changes in the work setting. (Tr. 93-132).

## IV. The Vocational Testimony

A vocational expert, Mr. Pinti, also testified at the administrative hearing. His testimony begins at page 51 of the record.

Mr. Pinti was told to assume that Plaintiff had no relevant work experience. He was then asked some questions about a hypothetical person who had no exertional limitations but who had to avoid exposure to hazardous machinery and unprotected heights. Additionally, that person would be limited to work without loud noise, work which was simple, routine, and repetitive in nature and could be performed in a low-stress setting. The person also could make only simple work decisions, deal with few changes in the work setting, and have only occasional contact with the public, coworkers, and supervisors. According to Mr. Pinti, someone with those restrictions could do jobs such as industrial cleaner or janitor, packager, or production helper (all medium jobs) or, at the light exertional level, machine tender, laundry folder, or housekeeper. Mr. Pinti also identified a number of

sedentary jobs, and he provided numbers indicating that the jobs at all three of these exertional levels existed in significant numbers in the economy. The numbers would be reduced for someone who needed a sit-stand option or who could sit for only fifteen minutes out of each hour, but jobs would still be available for someone with either of those restrictions.

Mr. Pinti was then asked by Plaintiff's attorney whether someone who would be off task 25% to 50% of the day could be employed; he said no. The same would be true for someone with a very short attention span or who could not handle work stress. If someone were unable to carry through with tasks or follow instructions 11% to 25% of the time, that person might be able to work, although he could not be off task more than 15% of the time and still be employed.

V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 13 through 27 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements for disability benefits through September 30, 2010, but not thereafter. Next, Plaintiff had not engaged in substantial gainful activity from his alleged onset date of April 30, 2010 through the date of the decision. As far as Plaintiff's impairments are concerned, the ALJ found that Plaintiff had severe impairments including "migraines with a history of a dysfunctional carotid artery; mood disorder; anxiety disorder; and cannabis dependence" (Tr. 16). The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional

capacity to perform medium work with these limitations: no exposure to hazardous machinery or working at unprotected heights; avoid concentrated exposure to chemicals/irritants; no very loud work; low stress work, that is, no fast paced work, no production quotas, only simple decisions, and few changes in the work setting; and only occasional contact with the public, coworkers, and supervisors. The ALJ found that, with these restrictions, plaintiff could not perform his past relevant work, but could perform the jobs identified by Mr. Pinti, including industrial cleaner/janitor, packager, production helper, machine tender, laundry/garment folder, hotel/hospital cleaner, inspector, sorter, and surveillance system monitor, and that such jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

      VI.  <u>Plaintiff's Statement of Specific Errors</u>

In his statement of specific errors, Plaintiff raises a single issue (but with subparts). He argues that the ALJ did not properly weigh or evaluate the treating source opinion evidence and gave too much weight to the opinions of non-treating and non-examining sources. The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

<u>Standard of Review.</u> Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" <u>Id</u>. <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th

Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

As in any case where the Plaintiff takes issue with the ALJ's rejection of a treating source opinion, the Court begins with a detailed description of the ALJ's rationale.  That rationale is found on pages 19 through 26 of the administrative record, and particularly on pages 23 to 25.

The ALJ began her discussion of Plaintiff's residual functional capacity by reviewing his activities of daily living. According to the ALJ, those consisted of watching television, caring for himself (including preparing simple meals), doing household chores, driving, shopping, paying bills, playing video games, and "hanging out" with friends.  She then reviewed the medical records concerning his symptoms and found that "[t]he claimant's complaints of disabling mental symptoms are ... unsupported by objective medical evidence." (Tr. 20).  She noted that the September, 2010 emergency room admission was preceded by Plaintiff's having ingested opiates and marijuana and having been off his medications for several months.  Similar issues

-8-

precipitated his emergency room visit the following September. Therapist notes showed a relatively stable mental state, with Plaintiff being able to control the voices he heard and suffering from "some" depression. Those same notes described Plaintiff as having a positive mood, clear thoughts, and calm behavior. Dr. Griffith's notes were also characterized as showing "no more than mild to moderate findings" and improvement in Plaintiff's symptoms when he took his medication. (Tr. 21). Those records, taken together with Plaintiff's activities of daily living, including his being able to get along with people in social or business settings, led the ALJ to conclude that his activities of daily living were also inconsistent with someone suffering from a disabling mental impairment.

    The ALJ then discussed the state agency reviewers' findings concerning the level of mental impairment and gave them significant weight because they were "generally supported by objective mental status findings ...." (Tr. 23). She reviewed Dr. Hrinko's report, noted that it had been "adequately addressed in the prior unfavorable decision" (Plaintiff had applied for benefits once before and was turned down), and rejected that portion of it dealing with the effects of Plaintiff's migraine headaches.

    Finally, she discussed the two opinions given by Dr. Griffith. After acknowledging that the opinion of a treating source must, if well-supported and not inconsistent with other substantial evidence in the record, be given controlling weight, the ALJ rejected Dr. Griffith's opinions because they were "unsupported by objective signs and findings in the preponderance of the record." She then referred to the previous discussion about the progress notes, the effectiveness of treatment, and the normal mental status examinations. Finally, she concluded that the mental restrictions which were made part of the residual mental capacity assessment, including limiting Plaintiff to low-

stress work with little interpersonal contact, accounted for any limitations found by Plaintiff's therapist. (Tr. 25-26).

Plaintiff advances several reasons why, in his view, the ALJ's decision is unsupportable. He argues, first, that the ALJ never determined whether Dr. Griffith's opinions were well-supported by clinical diagnostic techniques, and that the records show that they were. Second, he argues that the ALJ's reading of Dr. Griffith's treatment notes was selective and slanted. He also contends that the state agency reviewers upon whose opinions the ALJ relied not only did not examine him, but they did not have the benefit of reviewing Dr. Griffith's treatment notes from January, 2012 forward or her opinion letter. Finally, Plaintiff asserts that the ALJ also engaged in a selective reading of the treatment notes from his therapist, Mr. Crook.

In response, the Commissioner notes that the ALJ both recited and applied the various factors set forth in the applicable regulation, 20 C.F.R. §416.927(d), which relate to treating source opinions. The Commissioner argues that the ALJ gave good reasons for discounting Dr. Griffith's views, including the relatively mild findings found in her treatment notes - examples of which the Commissioner cites - and properly found that the state agency reviewers (in particular, Dr. Edwards) both had access to most of the relevant treatment notes and gave fair consideration to Dr. Griffith's findings. The Commissioner also points out that Mr. Crook is not an acceptable medical source and that, in any event, the ALJ also properly took his reports into account in shaping Plaintiff's mental residual functional capacity.

Of course, it has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(d)(or, as it relates to an SSI claim,

-10-

§416.927(d)); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

  From the Court's perspective, this case turns mainly on the question of whether the ALJ fairly characterized the treatment and progress notes of Dr. Griffith and Mr. Crook, or took isolated statements in those notes out of context in order to support a less restrictive view of Plaintiff's residual functional capacity.  As many courts have observed, an ALJ may properly rely on treatment notes as evidence that a claimant is not as impaired as the treating source has said, and if those notes support the ALJ's conclusions, the ALJ's opinion is entitled to deference under the "substantial evidence" standard of review.  See, e.g., Sanders v. Commissioner of Social Sec., 2012 WL 3309651, *5 (S.D. Ohio Aug. 13, 2012), adopted and affirmed 012 WL 4442775 (S.D. Ohio Sept. 25, 2012); Yates v. Astrue, 2011 WL 881519, *7 (N.D. Ill. March 11, 2011); Gomes v.

Astrue, 2009 WL 4015595, *2 (D.R.I. Nov. 19, 2009).  On the other hand, if an ALJ does not accurately describe the content of treatment notes and, for that reason, incorrectly states that they do not support the treating source's opinions, that decision is not supported by substantial evidence.  See, e.g., Freeman v. Commissioner of Social Sec., 2013 WL 3480343, *5 (N.D. Ohio July 10, 2013).

After a careful review of the treatment notes, most of which were recorded by Mr. Crook, the Court concludes that the ALJ fairly interpreted those notes as not completely supportive of Dr. Griffith's opinions.  The ones preceding Dr. Griffith's January, 2012 opinion do not reflect serious issues in either social or work-related functioning.  They show that Plaintiff was able to look for work, including going to job fairs, to participate in applying for social security benefits, and to handle frustration (such as not being able to locate the social security office).  The notes also reflect decreased depression, attributed to the fact that Plaintiff's medication was working, and minimal interference from hearing voices.  Plaintiff was also described as being ready to accept responsibility for helping to raise his girlfriend's child.  Much of his depression was attributed either to his lack of employment or to relationship issues, either with a girlfriend or with his grandparents.  He did express antisocial thoughts, but the notes do not demonstrate any extreme difficulty with social functioning, and his mood was generally described as stable.

The second set of notes (only a few of which appear to have been recorded by Dr. Griffith herself) are similar.  The latest note in the file, dated July 23, 2012, only eight days before Dr. Griffith's opinion letter, shows that Plaintiff's mood was positive, his thought processes were clear, and his behavior was calm.  The preceding note showed him to be pleasant, cooperative, and talkative (although tired).  His mood swings were under

control, although he admitted to feeling overwhelmed at times. In a note made by Dr. Griffith, Plaintiff admitted to having been off his medications when she first evaluated him, and said the medications had enabled him to cut down on his marijuana use.  He was excited and nervous about his upcoming wedding and he appeared pleasant, with a full mood and affect which was "generally OK."  (Tr. 582).  Her prior note shows that his mood was good and that he felt "sane."  (Tr. 590).  He missed a number of counseling sessions during this six-month period, and at others was described as having a positive mood and logical thought processes, accompanied by some anxiety and depression. Another note from Dr. Griffith again mentions some break in Plaintiff's taking his medications.  Generally, according to Mr. Crook's notes, Plaintiff's mood, thought process and behavior was unchanged from one visit to the next.  When that was not the case, the notes characterized Plaintiff as having "some" depression or delusions.  On at least one occasion, Dr. Griffith's notes described him as "not depressed" and she generally recorded abnormalities in mood or affect as mild. Plaintiff also told her he was looking for work.

    Taken together, these notes can be fairly read as at least somewhat inconsistent or unsupportive of Dr. Griffith's more extreme limitations.  It is important to note that the ALJ did not find Plaintiff to be without functional impairments due to his psychological conditions; rather, she found that he was limited to work that was simple, routine, and repetitive in nature and could be performed in a low-stress setting, and that he could make only simple work decisions, deal with few changes in the work setting, and have only occasional contact with the public, coworkers, and supervisors.  These findings struck a reasonable balance between Dr. Griffith's opinions and that of other examining or reviewing sources.  Because the ALJ both had, and articulated, valid reasons, supported by the record, for

discounting Dr. Griffith's opinions to the extent she did, this Court must, under the "substantial evidence" standard, affirm her decision.

### VII. Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

### VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp

```
                                        United States Magistrate Judge
```